IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MAURICE HENDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 2:11-CV-03159-KOB |
| MICHAEL ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On July 14, 2009, the claimant, Maurice Henderson, applied for supplemental security income under Title XVI of the Social Security Act. (R. 13). The claimant alleged disability commencing on December 31, 2004, because of depression. (R. 55). The Commissioner denied the claim on June 20, 2010. The claimant filed a timely request for a hearing before an Administrative Law Judge and the ALJ held a hearing on September 10, 2010. In a decision dated October 20, 2010, the ALJ found the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R. 13). On July 25, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 3). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

1

## II. ISSUE PRESENTED

As part of his three-page memorandum brief in support of his complaint, the claimant's half-page argument section presents only the following issue for review: whether the ALJ's decision was supported by substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusions." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

This court must affirm the ALJ's decision if the factual conclusions are supported by substantial evidence. *Graham*, 129 F.3d at 1422. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). Substantial evidence is more than a mere scintilla. *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). Under this limited standard of review, the court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## V. FACTS

The claimant has a tenth grade education and was fifty-two years old at the time of the administrative hearing. (R.190). He has never worked at substantial gainful activity levels. (R. 24). The claimant alleged he was unable to work because of depression and post traumatic stress disorder. (R. 189). The claimant testified that he received a diagnosis of Hepatitis C in April, 2010. (R. 197).

The claimant has a long history of using Birmingham Health Care (BHC) for his immediate medical needs. On February 21, 2000, the claimant received treatment at BHC for a cold. On March 3, 2000, the claimant complained of rashes on his body, and BHC noted he had a history of syphilis. On March 27, 2000, BHC treated the claimant for back pain. On May 5, 2000, the claimant asked BHC to check his blood pressure. On June 23, 2000, the claimant requested condoms from BHC. On October 2, 2000, the claimant complained of congestion and again requested condoms. BHC medical records for all of these visits noted the claimant's history of substance abuse. (R. 136-138).

On November 27, 2004, Dr. Brian Tierney admitted the claimant into the emergency room at Brookwood Medical Center with complaints of chest pain and suicidal ideations. The claimant informed the medical staff he had been drinking and smoking crack the night before coming to the hospital. (R. 122). Dr. Shawn Harvey, a one-time treating physician, then admitted the claimant to the Dual Disorder Unit at Brookwood for treatment of the claimant's polysubstance dependence. (R. 109). Another one-time treating physician, Dr. Armand Schachter, noted in the claimant's psychiatric history and physical report that the claimant had a twenty-year history of alcohol and cocaine dependence and had spent 18 months in a National

Institute on Drug Abuse (NIDA) program. Dr. Schachter rated the claimant's Global Assessment of Functioning (GAF) at 10. (R. 111). According to the Diagnostic and Statistical Manual of Mental Disorders (DSM), a GAF of 10 would indicate "persistent danger of severely hurting self or others . . . or serious suicidal act with clear expectation of death." (R. 19). The claimant's discharge summary indicated that by the end of his hospital stay, his sleep, appetite and energy had all improved. The claimant re-entered the NIDA program and was released with a GAF on discharge of 40. (R. 110). As stated in the DSM, a GAF of 40 would indicate major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (R. 19).

Four months later, on April 3, 2005, the claimant re-entered the emergency room at Brookwood Medical Center complaining of suicidal thoughts and daily use of crack cocaine and alcohol. The records indicated the claimant had a long-standing history of depression and that after the claimant was detoxed in November, 2004, he stayed clean for only a few weeks. Dr. Howard Strickler admitted the claimant to the hospital for detoxification. Dr. Strickler recorded that the claimant stated that two days previous to his hospital admission he tried to kill his wife. The claimant also stated to Dr. Strickler that he had used cocaine the night prior to admission. The claimant admitted to long-standing drug and alcohol abuse, as well as depression for many years. Dr. Strickler gave the claimant a GAF score of 40. Dr. Strickler's discharge summary notes indicated that after a five-day hospital stay, the claimant's depression improved and his detoxification progressed without complications. (R. 101-105).

The record reflects a four-year gap in medical treatment. On August 6, 2009, shortly after the claimant filed for SSI benefits, he was treated at BHC. Amin Islam, a Physician's Assistant at BHC, prescribed Prozac and Bupap for the claimant. The medical note from this visit stated that

the claimant "feels depressed, sad, [and] blue all the time since his mother died." On August 24, 2009, Sharon Harper, a Licensed Professional Counselor, implemented a comprehensive treatment plan for the claimant, consisting of bi-monthly counseling sessions and anti-depressant medications. On October 12, 2009, the claimant received a refill prescription for Prozac. (R. 127-131).

On November 12, 2009, the Social Security Administration consulted a psychologist, Dr. Sally Gordon, for a one-time psychological evaluation of the claimant. The claimant stated to Dr. Gordon that he witnessed a mass murder in 1988, after which he was the victim of several armed robberies. He stated that his condition deteriorated with the death of his mother in 2006. Dr. Gordon noted that the claimant was fully compliant in taking his prescribed medication. Dr. Gordon found that the claimant had not used cocaine or marijuana for five years, and had been abstinent from alcohol for two years. Dr. Gordon went on to record that the claimant dressed cleanly and appropriately and appeared at the evaluation to be adequately groomed. She assessed the claimant with a GAF of 55. According to the DSM, a GAF of 55 would indicate moderate difficulty in social, occupational, or school functioning. (R. 20). Dr. Gordon concluded her evaluation by finding that the claimant would likely be able to improve "his emotional resiliency and capacity for social interaction with more frequent psychotherapy sessions, practice of specific stress management strategies, and additional psychotropic medications." (R. 143). However, she noted the claimant's psychological issues are likely to cause some impairment in his ability to work and maintain employment. (R. 141-144).

On December 17, 2009, a State agency reviewing physician, Dr. Lee Blackmon, conducted a review of the claimant's records. (R. 148). As part of this review, Dr. Blackmon

called Ms. Harper, the counselor who had set up the claimant's comprehensive treatment plan, for additional information regarding the claimant. Ms. Harper stated that she had seen the claimant in therapy four times since August, 2009, and she had given him a diagnosis of post-traumatic stress disorder, as well as cannabis and alcohol abuse and cocaine dependence, all in sustained full remission. Ms. Harper further stated that the claimant was attempting to obtain a house with two friends, and that the claimant feared that working would hinder his attempts to obtain disability services. Ms. Harper also indicated that the claimant was seeing some old hairdressing clients privately. She assessed the claimant with a GAF of 65. (R. 167). The DSM states that a GAF of 65 would indicate some difficulty in social, occupational, or school functioning, but generally functioning well. (R. 20). Dr. Blackmon summarized his review by noting that he expects the claimant to continue to make progress "with consistently attended therapy and medication management and with continued sobriety." (R. 162).

Some time before April 29, 2010, the claimant informed Ms. Harper he was feeling drained and lacked energy. (R. 168, 205). Ms. Harper arranged for the claimant to have a blood screen, the results of which indicated the claimant tested positive for Hepatitis C. (R. 168). The claimant testified he was not taking medication to treat his Hepatitis C at the time of the hearing, but he had a future appointment to address this condition. (R. 205).

On September 29, 2010, the claimant's attorney arranged for Dr. Alan Blotcky, a psychologist, to evaluate the claimant. Dr. Blotcky's report stated that the claimant had been struggling with post-traumatic stress disorder since 1988. He noted that the claimant had been abstinent from cocaine use for two years, and that he had not been in a substance abuse program since the 1980's. Dr. Blotcky recorded that the claimant appeared at the evaluation appropriately

7

attired and nicely groomed. He further noted that the claimant's testing scores placed him at the lower end of the Borderline range of intellectual abilities, and he assessed the claimant with a GAF of 50. A GAF of 50 would indicate serious impairment in social, occupational, or school functioning. He concluded his evaluation by stating that the claimant had a poor prognosis because of his post-traumatic stress disorder, stuttering, and limited intellect.(R. 170-174).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 43). At the hearing, the claimant testified that for the past fifteen years he had experienced panic attacks that were triggered by being around other people. The claimant testified that he has a panic attack at least once a week., typically lasting around five to ten minutes. The claimant went on to state that the severity of these panic attacks led to a diagnosis at one point of agoraphobia. In addition, the claimant testified he often had nightmares and difficulty sleeping, and was currently taking Trazodone to help him sleep. (R. 194-196).

The claimant testified that he received therapeutic treatment from Ms. Harper once or twice a month, but Ms. Harper had recently moved from Birmingham Health Care and he had not been reassigned to another counselor. (R. 193, 200). The claimant further testified that he had attempted to work at a McDonald's for three months in 2009, but an attempted robbery scared him so badly he could not return to work there. The claimant stated that his post traumatic stress disorder made him fearful to be around other people, and that for the last five years his condition had been particularly bad. The claimant's attorney asked if the claimant could perform a job where he was not around people, to which the claimant answered he was "always paranoid of

someone being there . . . ." The claimant also stated that he had developed a speech problem, and he often had difficulty with concentration and memory. (R. 201-203).

The claimant testified that he had recently received a diagnosis of Hepatitis C after reporting to Ms. Harper that he felt drained. The claimant testified he could do laundry, cook a little bit, keep his area of the house clean, and leave the house to grocery shop about once a month. The claimant further testified that he had no problems with his upper extremities, and while he did get cramps in his fingers, he could lift up to 50 pounds. The claimant denied having any history of strokes or cardiovascular problems. (R. 204-208).

A vocational expert, Mr. Donald Parsons, testified concerning the type and availability of jobs that the claimant could perform. (R. 209-214). The ALJ first described a hypothetical individual matching the claimant's age and educational capabilities, and limited the vocational expert's analysis to medium work. The ALJ then asked the vocational expert to assume that this hypothetical individual could have infrequent non-intensive interactions with the public, occasional interaction with co-workers, and work that was essentially isolated with occasional and casual supervision. The vocational expert testified that under these circumstances, the claimant could perform the work of an order puller, conveyor feeder off-bearer, and a laundry worker, and that these jobs existed in significant numbers in both the state and national economies. (R. 209-211).

The ALJ further questioned Mr. Parsons by asking him what occupations within the light exertional level the hypothetical individual could perform. Mr. Parsons responded that work as a label marker, merchandise marking clerk, and a routing clerk existed in significant numbers in the state and nation, all of which could be performed by someone matching the hypothetical

scenario proposed by the ALJ.(R. 211-212).

Finally, the ALJ asked Mr. Parsons for an assessment of the vocational significance of chronic psychological symptomotology deemed to be moderately severe to severe. Mr. Parsons replied that a moderately severe to severe level of interference from emotional and psychological problems would make it infeasible for a person to hold a full-time competitive job. Mr. Parsons further testified that psychological symptomotology of a chronic nature resulting in absences from work of four or more days per month would lead to termination of employment. (R. 213-214).

*The ALJ's Decision*

On October 20, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 13). First, the ALJ determined that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. Next, the ALJ found that the claimant's post traumatic stress disorder, depressive disorder, generalized anxiety disorder, Hepatitis C, and borderline to low average intellectual functioning qualified as severe impairments. The ALJ also found that the claimant's history of syphilis and headaches were non-severe, as was the claimant's alleged speech impediment. (R. 15-16).

The ALJ next considered if the claimant's severe impairments manifested the signs and diagnostic findings required by the listings of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. First, the ALJ determined that neither the medical evidence nor the records of the claimant's treating physician suggested a finding that the claimant's Hepatitis C met the listing-level severity. The ALJ then found that the claimant's mental impairments did not meet the relevant criteria listings. The ALJ determined the "paragraph B" criteria were wholly unmet: the

claimant only had mild restriction in activities of daily living, the claimant had no more than mild to moderate difficulties in social functioning, and the claimant had no more than moderate difficulties with regard to concentration, persistence, or pace. The ALJ also found that the evidence failed to establish the presence of any "paragraph C" criteria. (R. 16-17).

Next, the ALJ determined the claimant had the residual functional capacity to perform medium work. (R. 17). The ALJ found that the claimant's medically determinable severe impairments "could reasonably be expected to produce some symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. 21).

To support this conclusion, the ALJ first determined that no medical evidence existed "of anything more than a diagnosis [of Hepatitis C]." (R. 21). The ALJ left the record open for 21 days following the hearing in order to secure additional and more current medical records from the claimant. (R. 214). However, the claimant presented no additional records to support a claim that the Hepatitis C imposed significant limitations or restrictions upon the claimant's ability to work. In addition, the ALJ noted that the claimant testified he could lift 50 pounds and experienced no other significant physical limitations or restrictions. (R. 21).

The ALJ then found that the record suggested the claimant's testimony concerning his employment history lacked credibility. Although Ms. Harper's statement indicated the claimant had returned to his past work as a cosmetologist, the ALJ noted that the claimant testified to the contrary. Moreover, Ms. Harper stated the claimant feared returning to work would hinder his attempts to obtain disability benefits. The ALJ determined that the claimant's attempt to work at a McDonald's for three months directly contradicted his testimony that he had panic attacks

caused by his fear of other people. Having noted these discrepancies, the ALJ concluded that the case record contradicted the claimant's statements and testimony, thereby reducing the claimant's credibility. (R. 21-21A).

The ALJ also determined that the claimant's lack of medical records from 2005 to 2009 undermined his claims regarding the severity of his symptoms. After noting that the first mention of the claimant's post-traumatic stress disorder was in 2009, not in 2005, the ALJ further found that the claimant produced no evidence that his mental condition caused him significant limitations or restrictions. Additionally, the claimant's testimony that he did simple household chores directly contradicted the claimant's adult function report of October 2009. Also, the record indicated the claimant appeared at multiple medical assessments neatly dressed and appropriately groomed, directly contradicting the claimant's statements that he did not consistently take care of his personal hygiene. (R. 21A-22).

The ALJ concluded by stating the amount of weight given to the records of each physician. Finding numerous inconsistencies in Dr. Blotcky's psychological evaluation, the ALJ consequently gave little weight to his opinion. Instead, the ALJ significantly relied upon Dr. Gordon's and Ms. Harper's findings, noting their reports and conclusions were consistent with the claimant's treatment records. (R. 22-23).

Finally, the ALJ noted, based on the vocational expert's testimony, that jobs exist in significant numbers in the national economy that the claimant could perform, given his age, education, work experience, and residual functional capacity. Although the ALJ found that the claimant's ability to perform all or substantially all of the requirements of medium-level work was impeded by certain limitations, the vocational expert's testimony indicated the erosion to the

unskilled medium occupational base caused by these limitations did not prohibit the claimant from both medium and light exertional level work. The ALJ ultimately determined the claimant was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 24-25).Therefore, he found that the claimant was not disabled under the Social Security Act.

## VI. DISCUSSION

The claimant argues that the ALJ's decision was not supported by substantial evidence. To the contrary, this court finds the ALJ provided substantial evidence to support his finding that the claimant was not disabled under the Social Security Act.

An ALJ must base a determination of disability upon substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In other words, substantial evidence is more than a mere scintilla." *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998) (citations omitted) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 400 (1971)). This court's review "cannot be an independent foray into the record . . . if there is substantially supportive evidence, the findings [of the ALJ] cannot be overturned." *Barron v. Sullivan*, 924 F.2d 227, 229-30 (11th Cir. 1991).

In this case, the argument section of the claimant's brief is one-half page, leaving the government, and indeed the court, to speculate about his specific reasons for claiming that substantial evidence does not exist. The only specific argument the claimant makes is that the ALJ based his decision on nothing more than a failed work attempt at McDonald's. The court disagrees.

Before assessing the claimant's residual functional capacity, the ALJ examined the

claimant's medical records to determine if the severity of the claimant's impairments equaled one of the listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. This examination noted that the claimant testified to cooking simple meals, paying his own bills, cleaning his house, and grocery shopping, all of which indicated that the claimant had only a mild restriction on conducting activities of daily living. The ALJ further noted that the claimant worked at McDonald's for a short time, an activity that directly contradicts the claimant's testimony that he had agoraphobia or fear of people. The record also indicated the claimant was privately seeing old hairdressing clients. Additionally, the claimant indicated to Ms. Harper a desire to go back to school to become a CNA to work with the elderly, again in direct contradiction to his claims of post traumatic stress and paranoia. Finally, the ALJ noted that the claimant's examining physician recorded that the claimant could repeat a complex sentence, execute a three-stage command, and learn four words in a single trial. These actions demonstrated the claimant had no more than moderate difficulties with concentration, persistence, or pace.

      The ALJ also based his residual functional capacity assessment on substantial evidence. After an extensive description of the claimant's medical records, the ALJ proceeded to evaluate the claimant's allegations in light of the factors found in SSR 96-7p. The ALJ cited Ms. Harper's statements that the claimant had returned to his past work as a cosmetologist, and that the claimant feared returning to work would hinder his attempts to obtain disability benefits. The ALJ also noted that the claimant's attempt at working at McDonald's in 2009 contradicted his testimony that he was afraid to be around people. The ALJ found that the claimant's GAF scores steadily improved, from an assessment of 10 in 2004, to Ms. Harper's assessment of 65 in 2009, indicating that the claimant's treating therapist believed he had only mild impairment. The ALJ

further found the lack of medical records from 2005 to 2009 contradicted the claimant's allegations of a debilitating condition. The ALJ specifically notified the claimant that he would leave the record open for 21 days to allow the claimant to supplement the file with any missing records; the claimant provided no further medical documentation of any treatment from 2005 to 2009. What evidence the claimant did provide, the ALJ considered and expressly dismissed. Dr. Blotcky's report contained numerous internal inconsistencies, all of which the ALJ expressly noted. The ALJ further articulated which evidence he relied upon in making his determination, along with deliberate statements of how much weight he gave to the medical opinions in the record.

Based on the explicit findings of the ALJ, this court concludes that he properly applied the relevant legal standards and that substantial evidence supports his decision. Therefore, this court affirms the decision of the Commissioner.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 13th day of February, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE